******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# JODI BIALIK *v.* SCOTT BIALIK
## (AC 44699)

Alvord, Clark and Seeley, Js.

*Syllabus*

The plaintiff, whose marriage to the defendant previously had been dis-
solved, appealed to this court from the judgment of the trial court
modifying the defendant's alimony obligation. The parties' separation
agreement, which was incorporated into the judgment of dissolution,
required the defendant to make weekly alimony payments of $2769.23
to the plaintiff, an amount that was nonmodifiable downward unless the
defendant earned less than $350,000 in annual adjusted gross earnings.
Adjusted gross earnings was defined in the separation agreement, in
part, as gross business receipts less business expenses. The defendant
claimed that a substantial decrease in his annual income from his dental
practice as a result of the COVID-19 pandemic constituted a change in
circumstances that warranted a reduction in his alimony payments.
The trial court heard expert testimony that the parties presented from
accountants about the defendant's financial circumstances and his
receipt of $159,000 in loans and grants the federal government distrib-
uted in 2020 to businesses nationwide to help offset their loss of income
during the COVID-19 pandemic. Both parties' accountants believed that
the federal government would forgive the full amount of the loans. The
plaintiff's accountant, T, determined that the defendant would not incur
any federal income tax obligation due to the government's forgiveness
of the loans and that the defendant would benefit from the deduction
of payroll expenses on his corporate tax return. The defendant's accoun-
tant, L, determined that the defendant had adjusted gross earnings of
$240,123 in 2020, which did not include the funds received from the
federal government, and that the proceeds of the loans would not reduce
the defendant's expenses or be considered income or forgiveness of
debt. The court concluded that the defendant had established a change
in circumstances on the basis of L's determination that the defendant
had adjusted gross earnings of $240,123 in 2020. The court reasoned
that the federal funds were intended as one-time emergency loans that
should not be considered as ordinary income. The court reduced the
defendant's weekly alimony payment to $1038 and required the plaintiff
to reimburse him for his overpayment of $34,853 in alimony. On appeal,
the plaintiff claimed, inter alia, that the court's conclusion that the
defendant had established a change in circumstances was incorrect as
a result of the court's failure to include the federal funds in its calculation
of his adjusted gross earnings. *Held*:

1. The trial court improperly calculated the defendant's adjusted gross earn-
ings by failing to include the federal funds he received, and, because
the court's finding of a substantial change in circumstances was predi-
cated on that incorrect calculation, the court's modification of his ali-
mony obligation had to be reversed and the case remanded for a new
modification hearing: the federal funds constituted gross business
receipts within the separation agreement's definition of adjusted gross
earnings and, thus, cash flow that was transferred into the defendant's
business; moreover, the funds were virtually indistinguishable from ordi-
nary business receipts, and the trial court understood that the federal
government intended the funds to be essentially replacement business
income; furthermore, despite the defendant's contention to the contrary,
this court was not convinced that the funds should be excluded from
gross business receipts merely because the federal government dis-
bursed them for targeted purposes or intended them to be one-time or
emergency disbursements.

2. The trial court's acceptance of L's calculation as to the defendant's
$7974.18 tax deduction for disability insurance payments in 2020 was
clearly erroneous, as that finding was not supported by the evidence:
L testified that he did not know the exact amount the defendant spent
on disability insurance as part of the defendant's business overhead,
and both L and the defendant testified that some portion of the $7974.18

should have been added back into the defendant's adjusted gross earnings as defined in the parties' separation agreement.

Argued May 12—officially released October 4, 2022

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the court, *Winslow, J.*, rendered judgment dissolving the marriage and granting certain other relief in accordance with the parties' separation agreement; thereafter, the court, *Truglia, J.*, granted the defendant's motion for modification of alimony and denied the plaintiff's motions for contempt and contribution for certain expenses, and the plaintiff appealed to this court; subsequently, the court, *Truglia, J.*, issued an articulation of its decision. *Reversed in part*; *further proceedings*.

*Christopher P. Norris*, for the appellant (plaintiff).

*Laura A. Goldstein*, with whom was *Eva M. DeFranco*, for the appellee (defendant).

*Opinion*

ALVORD, J. The plaintiff, Jodi Bialik, appeals from the postjudgment ruling of the trial court granting the motion of the defendant, Scott Bialik, for a modification of his alimony obligation. On appeal, the plaintiff claims that the court erred in (1) failing to consider the impact of funds received by the defendant's dental practice from the federal Paycheck Protection Program (PPP); see 15 U.S.C. § 636 (a) (36); and the Economic Injury Disaster Loan (EIDL) program; see 15 U.S.C. § 636 (b) (2); both of which are administered by the United States Small Business Administration (SBA), in calculating the defendant's annual adjusted gross earnings, as defined in the parties' separation agreement, and (2) its treatment of disability insurance premiums paid by the defendant's business.[1] We agree with the plaintiff and, accordingly, reverse in part the judgment of the trial court.

The following facts and procedural history are relevant to our review of the plaintiff's claims. The court, *Winslow, J.*, dissolved the parties' marriage on December 14, 2016. At the time of the dissolution, the parties had two minor children, aged fifteen and twelve. The judgment of dissolution incorporated by reference the parties' separation agreement (agreement). With respect to alimony, the defendant was obligated to pay the plaintiff $2769.23 per week "until the first of the following to occur: either party's death, the [plaintiff's] remarriage, or ten (10) years from the dissolution of marriage." The parties agreed that alimony was "nonmodifiable as to an extension of the term."

Pursuant to Section 20 (C) of the agreement, the amount of alimony paid by the defendant to the plaintiff is "nonmodifiable downward unless the [defendant] earns less than . . . $350,000 . . . annual adjusted gross earnings. If the [defendant] earns less than . . . $350,000 . . . annual adjusted gross earnings, then the amount of alimony may be modifiable if a court of competent jurisdiction so determines, based on a motion for modification properly filed and proceeded upon."

Section 20 of the agreement defines "adjusted gross earnings" as "gross business receipts less business expenses, less straight-line depreciation of business equipment; with add-backs for the following: travel and entertainment expenses of $5,000.00 per year; advertising expenses in excess of $5,000.00 per year; any charitable contributions, owner's percentage of profit sharing; medical insurance of owner, attorney and accounting fees in excess of $15,000.00 per year, but not including professional fees paid in connection with insurance, tax or Medicaid audits; dues and subscriptions in excess of $3,600.00; auto expenses in excess

of $6,000.00; auto depreciation; home office rent or expenses; equipment for personal use; and any W-2 gross income paid to the owner."

The agreement also included safe harbor provisions, pursuant to which the plaintiff could earn up to $50,000 gross employment earnings annually, and the defendant could earn up to $700,000 "adjusted gross earnings annually," without either being deemed a substantial change in circumstances. (Internal quotation marks omitted.) The agreement stated that "[o]nly those sums which exceed the 'safe harbor' amount shall be considered in any proceeding for a modification of alimony, if the claim is an increase in . . . earnings. This 'safe harbor' amount and its term may be modified by a court of competent jurisdiction."

On March 22, 2018, the defendant filed a motion to modify his alimony obligation, in which he alleged, inter alia, that his "income ha[d] substantially decreased, which amount[ed] to a substantial change in circumstances." On October 1, 2018, the parties entered into a stipulated agreement, which provides in relevant part: "There shall be no modification of alimony at this time. It is agreed by the parties that if either party ever brings this matter back to court to address a change in alimony, the income of the parties to be considered shall be the incomes from date of dissolution and the then income of the parties when the motion is filed and/or addressed."[2]

On June 2, 2020, the plaintiff filed a motion for contempt in which she alleged that, beginning in March, 2020, the defendant unilaterally had reduced the amount of alimony he paid to her. She alleged, inter alia, that the defendant was $17,879.80 in arrears on his alimony payments.

On July 15, 2020, the defendant filed a motion to modify his alimony obligation, alleging that his annual income had decreased substantially and was less than $350,000. He represented, inter alia, that, "[d]ue to the unforeseeable COVID-19 pandemic, the defendant was forced to completely shutter his offices for months, resulting in little or no income. After the defendant was permitted to reopen, the number of patients has decreased significantly."

On January 8, 2021, the plaintiff filed a second motion for contempt, in which she represented that the defendant had refused to pay the previous arrearage "until days prior to the hearing on a contempt motion addressing that arrearage." She alleged that the defendant again was failing to pay his periodic alimony obligation and "has unilaterally determined he doesn't need to pay for [two] weeks."

The court, *Truglia, J.*, held an evidentiary hearing on the defendant's motion for modification and the plaintiff's two motions for contempt in April, 2021.[3]

The defendant presented the testimony of Frederick Landwehr, a certified public accountant and financial advisor who prepares the defendant's tax returns and financial statements. The plaintiff presented the testimony of Theodore Lanzaro, a certified public accountant and certified forensic accountant. Both parties also testified.

On April 12, 2021, the defendant filed revised proposed orders in which he requested that the court reduce his alimony obligation to $1038 per week and that the modification be made retroactive to the date of service of his motion for modification, August 8, 2020.

On April 20, 2021, the court issued its memorandum of decision. The court first found that the defendant had demonstrated a substantial change in circumstances in that his income from his business "ha[d] declined steadily since December, 2016." The court "accept[ed] the figures offered by the defendant" and found that he had annual adjusted gross earnings of $240,123 in 2020. The court next turned to the factors set forth in General Statutes § 46b-82 (a) and determined that "an alimony payment of $2769.23 per week represents an unreasonable portion of the defendant's current earnings."[4] The court reduced the defendant's weekly alimony obligation to $1038, as requested by the defendant in his revised proposed orders, and made its order retroactive to the date of service of the defendant's motion for modification, which was August 8, 2020. Applying the retroactive effective date, the court determined that the defendant had overpaid alimony in the amount of $34,853 and ordered the plaintiff to reimburse the defendant for the overpayment on or before June 1, 2021.

Considering the motions for contempt, the court determined "that the plaintiff has not carried her burden of proof by clear and convincing evidence that the defendant has wilfully violated the court's clear orders regarding payment of alimony." The court found that the defendant was "unable to comply with the [alimony] order after he was ordered to close his office in March, 2020, and again in December, 2020." The court additionally found "that the defendant acted in good faith at all times in his dealings with the plaintiff."[5]

On April 27, 2021, the plaintiff filed a motion to reargue, which was denied. Thereafter, the plaintiff filed a motion for articulation, asking the court to articulate its findings concerning the PPP and EIDL funds and disability insurance premiums paid as an expense of the defendant's business. The court denied the motion for articulation.[6] This appeal followed.[7]

We first set forth principles of law relevant to the plaintiff's claims. "[General Statutes §] 46b-86 governs the modification or termination of an alimony or support order after the date of a dissolution judgment. When . . . the disputed issue is alimony . . . the

applicable provision of the statute is § 46b-86 (a), which provides that a final order for alimony may be modified by the trial court upon a showing of a substantial change in the circumstances of either party." (Internal quotation marks omitted.) *Birkhold* v. *Birkhold*, 343 Conn. 786, 809, 276 A.3d 414 (2022). "Under that statutory provision, the party seeking the modification bears the burden of demonstrating that such a change has occurred. . . . To obtain a modification, the moving party must demonstrate that circumstances have changed since the last court order such that it would be unjust or inequitable to hold either party to it. Because the establishment of changed circumstances is a condition precedent to a party's relief, it is pertinent for the trial court to inquire as to what, if any, new circumstance warrants a modification of the existing order." (Internal quotation marks omitted.) *Malpeso* v. *Malpeso*, 189 Conn. App. 486, 499, 207 A.3d 1085 (2019).

Prior to addressing the plaintiff's claims, we note that the plaintiff does not claim on appeal that the defendant did not meet the agreement's $350,000 threshold for proceeding with a motion for modification. Additionally, both parties acknowledge that the safe harbor provisions contained in the agreement do not relieve the party seeking modification of the statutorily mandated burden of demonstrating a substantial change in circumstances. See *Budrawich* v. *Budrawich*, 200 Conn. App. 229, 255, 240 A.3d 688 (2020) (alimony provision permitting modification if plaintiff earns less than $100,000 per year did not relieve plaintiff of burden to demonstrate substantial change in circumstances), cert. denied, 336 Conn. 909, 244 A.3d 561 (2021). At issue in this appeal is whether the court erred in finding that the defendant sustained his burden of demonstrating a substantial change in circumstances.[8]

I

We first address the plaintiff's claim that the trial court erred in failing to include the PPP and EIDL funds in its calculation of the defendant's income for purposes of determining whether the defendant had shown a substantial change in circumstances warranting modification of his alimony obligation. Specifically, she claims that the court improperly accepted the determination of the defendant's expert that the defendant's 2020 adjusted gross earnings totaled $240,123, which did not include the PPP and EIDL funds or consideration of the nontaxable nature of those funds. We agree with the plaintiff that the court should have included the PPP and EIDL funds in its determination of the defendant's adjusted gross earnings. Because the court's finding of a substantial change in circumstances was predicated on the defendant's decreased earnings, without consideration of the PPP and EIDL funds, that finding cannot stand.

The following additional procedural history is rele-

vant to our resolution of this claim. As noted previously, both parties presented expert testimony at the hearing. Landwehr, the defendant's certified public accountant, calculated the defendant's 2020 adjusted gross earnings as $240,123, which did not include the PPP and EIDL funds. Landwehr opined that the EIDL grant and the PPP funds were not business receipts.[9] Landwehr testified with respect to the EIDL that it was "a grant that was paid to businesses in 2020. If they applied for the grant, they were applied up to $10,000 to get a grant that does not have to be paid back to stimulate the . . . business as a nontaxable item for the effects of the coronavirus on their businesses." On cross-examination, Landwehr acknowledged that the grant of the EIDL funds increased the defendant's cash flow but maintained that the grant did not increase his business income.

As to the PPP funds, Landwehr testified that funds in the amount of $75,000 were received by the defendant in April, 2020, and deposited into a separate account. The account's balance had been reduced to $39.99 by the end of July, 2020. Landwehr also acknowledged that the defendant received an additional $75,000 in PPP funds in 2021. Landwehr testified that it was a "loan," and that the defendant "has to provide proof that he used it to cover the payroll, rent, personal protection equipment, etc., then he has to submit for forgiveness." Landwehr described the purpose of the program as "tak[ing] people off the unemployment rolls" and testified that it was "for companies to pay those employees for not even coming to work."

Landwehr acknowledged that the defendant's practice would have had to generate additional taxable business receipts in order to produce the equivalent of the financial benefit afforded by the tax-free moneys provided by the federal government. As to whether a business would be required to reduce the related business expenses deduction on its tax return corresponding to receipt of the PPP funds, Landwehr testified that "an issue on the PPP was originally that it would be not income to a business, but it would have to reduce expenses of a business on the tax return. . . . Then they came back and said, it does not have to reduce expenses, the PPP was to help the economic cause of businesses to try and keep them in business. And therefore, the proceeds of that, once it's forgiven, would not reduce expenses and would not be considered income or forgiveness of debt." Landwehr testified that the defendant had not engaged him to apply for forgiveness of the PPP loan. Landwehr testified that he believed "the full amount [of the PPP loan] will be forgiven" but stated that he had not done that analysis yet.

The defendant testified that his business income had declined since the dissolution of the parties' marriage

in 2016. Specifically, he testified that, although he previously was the only pediatric dentist in his area, there recently had been an increase in pediatric dentists in his area, including corporate entities providing dental care. He further testified that more children had become covered under Medicaid and that Medicaid had not increased its rates since 2010.

With respect to the COVID-19 pandemic related decline in his income, the defendant testified that his office was closed from March 22 to May 22, 2020, except for emergency procedures. He explained that, because patients are seen every six months, he again had no patients scheduled from September to November, 2020. Also, the defendant was exposed to COVID-19 in December, 2020, and was required to close his dental practice for two weeks.

The defendant testified as to his understanding of the PPP loans, which was that the moneys were given to businesses to pay employees so as to prevent them from seeking unemployment compensation. When further questioned, he acknowledged that "[t]here were certain stipulations allowing a percentage of the rent" and utilities, but "either 85 or 65 percent of the PPP loan money had to be used on payroll." He also acknowledged in his testimony that he was hopeful that the PPP loans would be forgiven and explained that he had "furloughed [employees] for approximately four days because it was the four days between not having any money and then the PPP loan coming in."

Lanzaro, the plaintiff's expert, reviewed the defendant's financial information, including Landwehr's calculations, and prepared a report. Lanzaro testified regarding the PPP funds and the process for seeking forgiveness of the loan. Lanzaro reviewed the account in which the defendant had deposited the PPP funds and determined that his usage of the funds qualified for forgiveness. Lanzaro testified that he did not "see any reason why [the federal government] wouldn't give him 100 percent forgiveness."

Lanzaro testified that, in addition to incurring no federal income tax obligation due to the government's forgiveness of the PPP loan, the defendant also would benefit from the deduction of his payroll expenses on his corporate tax return. Lanzaro testified that, as long as the defendant similarly met the criteria of the program with respect to the 2021 PPP funds, the defendant would enjoy the exact same federal tax consequences.

The defendant requested that the court reduce his weekly alimony obligation from $2769.23 to $1038. In support of that request, the defendant argued that his income had decreased from $411,000 at the time of the marital dissolution in 2016 to approximately $240,000 in 2020. The plaintiff contended that certain amounts that had been excluded from the defendant's proposed

figures should be included in his adjusted gross earnings. Specifically, the plaintiff argued that $84,000 in PPP and EIDL funds that the defendant had received in 2020 should be added to his income from business operations. The plaintiff further maintained that, because the PPP and EIDL funds were not considered taxable income by the federal government, the defendant would have had to generate additional taxable business receipts greater than the sum of the PPP and EIDL funds in order to produce the equivalent of the benefit afforded by the tax-free moneys. Accordingly, the plaintiff argued, the court should adjust upward from the government moneys when calculating the defendant's adjusted gross earnings for 2020. The plaintiff argued for the same treatment of the $75,000 in PPP funds that the defendant received in 2021.

In its memorandum of decision, the court rejected the plaintiff's position that the $159,000 in PPP and EIDL funds should be included in calculating the defendant's adjusted gross earnings. The court stated that it "fully acknowledges and understands the plaintiff's argument that these funds were intended by the federal government to be, essentially, 'replacement business income.' Nevertheless, it is clear that the funds were also intended by the federal government as one-time emergency loans (not grants), which should not be considered as ordinary income. The court also notes that, according to the defendant's expert's uncontradicted testimony, if the PPP loans are forgiven, they are exempt from traditional Internal Revenue Code rules and regulations regarding cancellation of indebtedness income." The court accepted Landwehr's calculation as the "correct calculation of the defendant's 2020 adjusted gross earnings as defined by the agreement." On the basis of the decline in the defendant's income, the court found that there had been a substantial change in circumstances.

On appeal, the plaintiff claims that the court erred in finding a substantial change in circumstances because the court incorrectly determined that the PPP and EIDL funds should not be included in the defendant's adjusted gross earnings as defined by the agreement. "In a marriage dissolution action, an agreement of the parties executed at the time of the dissolution and incorporated into the judgment is a contract of the parties. . . . The construction of a contract to ascertain the intent of the parties presents a question of law when the contract or agreement is unambiguous within the four corners of the instrument. . . . The scope of review in such cases is plenary . . . [rather than] the clearly erroneous standard used to review questions of fact found by a trial court." (Internal quotation marks omitted.) *Steller* v. *Steller*, 181 Conn. App. 581, 588, 187 A.3d 1184 (2018). The language of the agreement in the present case, as incorporated into the dissolution judgment, is clear and unambiguous. Accordingly, our

review is plenary.

The parties' agreement defines "adjusted gross earnings" as "gross business receipts less business expenses, less straight-line depreciation of business equipment," with certain "add-backs . . . ." Thus, we must examine the nature of the funds at issue to determine whether they constitute "gross business receipts." The court had before it the testimony from both parties' experts that they believed that the full amount of the PPP loans would be forgiven, although Landwehr noted that he had not been hired to complete that process and, thus, had not "done that analysis yet." Lanzaro, however, had reviewed the account in which the 2020 PPP funds were deposited and determined that the defendant's usage of the funds qualified for forgiveness.[10] Moreover, the plaintiff entered into evidence a copy of the defendant's bank statement for the account into which the PPP funds were deposited and a copy of a sample PPP loan forgiveness application form. With respect to the EIDL grant, Landwehr acknowledged that it did not have to be repaid, describing it as a "grant that does not have to be paid back to stimulate the . . . business as a nontaxable item for the effects of the coronavirus on their businesses."

Having reviewed the evidence admitted at the hearing, we agree with the plaintiff that the PPP and EIDL funds should be included within the definition of "adjusted gross earnings" under the agreement, in that they constitute gross business receipts.[11] The PPP and EIDL funds are virtually indistinguishable from ordinary business receipts, differing primarily in their extraordinary dual tax favored status. The court aptly noted that it understood the plaintiff's argument that the funds were intended by the federal government to be "essentially, 'replacement business income.' " See N. Shafer, "Changing Tax Laws and Support: Keeping Up as the Ground Shifts," 33 J. Am. Acad. Matrim. L. 159, 174 (2020) ("For support purposes . . . how should [a hypothetical $100,000 PPP loan] be treated? The reality is that the business has $100,000 more of cash flow. Especially in a flow-through entity like an S Corp, partnership or LLC, or sole proprietorship, the reality of this financial shot in the arm of additional cash flow does not change the bottom line for tax purposes, but for cash flow purposes it could have an impact."). Thus, the PPP and EIDL funds constitute cash flow transferred into the defendant's business. Accordingly, we conclude, on the basis of this record, that the PPP and EIDL funds should be included in the calculation of the defendant's adjusted gross earnings.[12]

The defendant argues that the PPP and EIDL funds should not be included in his adjusted gross earnings because they "were expended as intended: to keep employees off of unemployment compensation and keep the business from closing." He notes that his staff

was furloughed for four days before he received the PPP funds and that he was able to bring back and retain his employees despite a two month shutdown of his practice and a lack of patients and revenue. He further emphasizes that the EIDL grant is titled as an "emergency" grant. We are not convinced that the funds should be excluded from gross business receipts merely because they were disbursed by the federal government for targeted purposes or were intended to be one-time or emergency disbursements.

Accordingly, we conclude that the court improperly calculated the defendant's "adjusted gross earnings" as set forth in the agreement. Because the court's finding of a substantial change in circumstances was predicated on the defendant's decreased earnings, the court's judgment modifying the defendant's alimony obligation must be reversed and the case remanded for a new hearing on the defendant's motion for modification.

II

We next address the plaintiff's claim that the trial court erred in accepting the calculations of the defendant's expert, who "testified that [the] defendant's payments to disability insurance was deducted as a business expense even though portions of same may not have been appropriately deducted from income."[13] The defendant responds that, "[e]ven if an undetermined fraction of the $7974.18 should have been added back into the defendant's adjusted gross earnings, this minor amount would have no impact on the finding of a substantial change in circumstances or the amount of the modification." We agree with the plaintiff that the court improperly accepted the calculation of the defendant's expert.[14]

The following additional facts and procedural history are relevant to our resolution of this claim. The defendant entered into evidence a document prepared by Landwehr that identified, under the category of "add backs," a line item titled "disability insurance (business overhead)" that had no amount correlated with it. Landwehr testified with respect to that item that overhead disability insurance is tax deductible, but that he did not have the breakdown on how much the defendant had spent on that disability insurance. Thereafter, the following colloquy occurred between the plaintiff's counsel and Landwehr:

"[The Plaintiff's Counsel]: So, we can't say whether or not the disability should or should not be added in because you can't tell us today, as an expert, whether it qualifies as a business expense?

"[The Witness]: What I'm telling—

"[The Plaintiff's Counsel]: (Indiscernible)'s paid, correct?

"[The Witness]: —what I'm telling you is, there's a

portion of an expense that he usually has labeled as disability—

"[The Plaintiff's Counsel]: Right.

"[The Witness]: —that is actually business overhead. Okay? I do not know the exact amount of that. Okay?

"[The Plaintiff's Counsel]: Right.

"[The Witness]: And, I'm not gonna guess without pulling out those records and—and doing it.

"[The Plaintiff's Counsel]: So, what's the total amount of the disability paid by [the defendant] in 2020?

"[The Witness]: Okay, the amount shown on the cash flow report is $7974.18. We do not know how much of that is for . . . disability and how much of that is for the business overhead.

"[The Plaintiff's Counsel]: So, if disability was 6500 of that, that would need to be added back? Would you agree with me?

"[The Witness]: That's correct. And, I testified that we did not do an analysis of that over—that business—the breakdown between the disability and the business overhead that's included in that account."

The defendant also testified that he did not know what portion of the coverage was attributed to business overhead, stating that "[i]t's all mixed together, and I don't understand . . . how to separate it." When asked whether he could obtain a breakdown, the defendant stated that "it would probably take me a while speaking to the agents, to figure out what the heck the breakdown is on it."

In its memorandum of decision, the court stated that it "accepts the analyses offered by the defendant's expert witness. The deduction taken for insurance noted by the defendant's expert is legitimate and reasonable in amount."

"[T]he trial court's findings [of fact] are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Norberg-Hurlburt* v. *Hurlburt*, 162 Conn. App. 661, 672–73, 133 A.3d 482 (2016).

In his appellate brief, the defendant does not contend that no portion of the disability insurance premiums should have been added back into his earnings. Rather, he emphasizes that adding back into his earnings "an undetermined fraction of the $7974.18" would have no impact on the finding of a substantial change in circum-

stances. We agree with the plaintiff that the court erred in accepting the calculations of the defendant's expert. Both the defendant's expert and the defendant himself testified that some portion of the $7974.18 should have been added back into the defendant's adjusted gross earnings as defined in the agreement. The court, however, found the insurance premium deduction to be legitimate and reasonable. That finding is not supported by the evidence and, therefore, is clearly erroneous.

The judgment is reversed only as to the defendant's motion to modify alimony and the case is remanded for a new hearing on that motion; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiff also claims on appeal that (1) the court erred in "not considering [funds received from the United States Department of Health and Human Services (HHS)] as income and appears to have not realized that the defendant's expert had removed the HHS moneys from his calculation of adjusted gross income," (2) the court abused its discretion in reducing the amount of the defendant's alimony obligation by $90,000 per year after determining that the defendant's income was $110,000 below the threshold for modification, and (3) abused its discretion in ordering the modification in alimony payments retroactive to the date she was served with the motion for modification. Because we reverse the court's judgment on the motion for modification of alimony and remand the case for a new hearing on that motion, we need not consider the plaintiff's claim regarding the court's treatment of the HHS funds or her claims that the court abused its discretion in reducing the amount of the alimony payments and ordering that the modification be retroactive to the date of service. See *Steller* v. *Steller*, 181 Conn. App. 581, 599, 187 A.3d 1184 (2018). We will, however, consider the plaintiff's claim that the court erred in its treatment of the disability insurance premiums, as this issue is likely to arise on remand.

Finally, the plaintiff claims on appeal that the court improperly denied her motions for contempt, in which she alleged that the plaintiff was in arrears on his alimony payments to her. The defendant responds, inter alia, by noting that the plaintiff "provides no case law or statutory references to support any aspect of her claim that the trial court's decision with regard to the motion for contempt was in error." We conclude that the plaintiff's claim is inadequately briefed and, therefore, we decline to review it.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *Scalora* v. *Scalora*, 189 Conn. App. 703, 735–36, 209 A.3d 1 (2019). In the present case, the plaintiff's brief is devoid of citation to legal authority. The entirety of her briefing of this claim consists of representations as to the defendant's income, expenses, and arrearage, and block quotations from the transcript of the hearing on the parties' motions. The plaintiff has failed to proffer any authority or analysis in support of her claim. Accordingly, we decline to review it.

[2] The parties also agreed that "[t]he [defendant] shall not have the right to file any motion(s) to modify alimony prior to December 31, 2020, if such reduction is based upon a reduction of his earned income as calculated in the manner set forth in the initial dissolution judgment and claimed to be below the $350,000 gross income level required by the dissolution judgment unless" certain preconditions were met. The court stated in its memorandum of decision that it had determined, after a hearing, that the defendant had met such preconditions.

[3] The court also heard evidence with respect to a motion filed by the plaintiff seeking contributions from the defendant for the private school expenses of the parties' youngest child. In its memorandum of decision, the court denied this motion after finding that "the defendant does not have

sufficient resources with which to pay the plaintiff's proposed order for contribution." The plaintiff does not challenge this ruling on appeal.

[4] The court stated: "The court found both parties credible. The parties are close in age, and both appear to be in good overall health. The court notes that the defendant now has no significant assets other than his practice and the equity in his personal residence . . . while the plaintiff's assets have remained steady since the time of judgment . . . . The plaintiff has not worked in her field during the marriage; her earning capacity is therefore much smaller than the defendant's. The court understands that the plaintiff relies on the alimony award to meet her current expenses and to maintain her station in life. The plaintiff, however, currently has income from her work as a preschool teacher. She also receives steady child support from the defendant.

"The court also understands that the parties' marriage was a long one and that the original alimony award represents a return on the plaintiff's significant investment over time in the defendant's earning capacity. With regard to the parties' respective expenses, the court appreciates the plaintiff's desire to continue the younger child's private school education; the child is doing well at the school, and she should continue her studies there . . . . The court also takes into consideration the costs of the defendant's choice of daily transportation . . . . Nevertheless, after consideration of all of the factors of § 46b-82, it is clear that an alimony payment of $2769.23 per week represents an unreasonable portion of the defendant's current earnings." (Citations omitted; footnotes omitted; internal quotation marks omitted.)

[5] In support of this finding, the court noted that "[t]he defendant notified the plaintiff in writing in advance in the spring of 2020 that it was unlikely that he would be able to meet his obligations . . . ." (Citations omitted.) For example, one such notification states: "As of today, I have heard that my Emergency Payroll Loan (PPP Loan) application was accepted and sent to the SBA for processing. I have not received any funds for that nor the SBA Emergency Disaster Relief (EDIL Loan). The Dental Office has been closed and there isn't enough coming in to cover the overhead. I have arranged for the child support payment to be paid in full from my personal savings, and it will be transferred Fri. As for the Alimony, right now I simply do not have the income to cover any of it. I was unable to even transfer any money to myself. If/when these loans come in I will notify you and we can figure things out. I just wanted to give you a heads up beforehand."

[6] The plaintiff also had requested that the court articulate "how it considered the approximately $16,000 the defendant received from [the United States Department of Health and Human Services (HHS)], which was considered taxable business income by the defendant's expert as recently as [two] weeks prior to hearing into the calculation of the defendant's 2020 income." On May 13, 2021, the plaintiff filed with this court a motion for review of the denial of her motion for articulation. On June 16, 2021, this court granted the plaintiff's motion for review and granted, in part, the relief requested therein. On June 21, 2021, the trial court issued its articulation with respect to the HHS funds.

[7] On May 26, 2021, the plaintiff filed a motion requesting that the court stay its order directing her to reimburse the defendant for overpaid alimony resulting from the court's retroactive modification order, and the defendant filed an objection thereto. The court denied the motion, and the plaintiff filed a motion for review with this court. This court sua sponte ordered the trial court to provide a memorandum of decision regarding its denial of the plaintiff's motion for a stay. On August 9, 2021, the trial court issued its memorandum of decision, and, thereafter, this court granted the motion for review but denied the relief requested therein.

[8] We also note that neither party raises a claim on appeal that the trial court erred in using the definition of "adjusted gross earnings" contained in the parties' agreement in determining that the defendant had shown a substantial change in circumstances. Although the plaintiff's counsel suggested during oral argument before this court that the trial court was not required to use the formula, the plaintiff does not raise the issue on appeal as a claim of error.

[9] Landwehr explained: "My understanding of gross receipts is from services provided in the business, and this is not for services provided in the business."

[10] On cross-examination, the defendant's counsel did not challenge Lanzaro's determination that the usage of the PPP funds qualified for forgiveness.

[11] Because there was no competent evidence that the PPP funds would

be required to be repaid, our conclusion does not implicate the long-standing guidance that, generally speaking, a bona fide loan is not to be considered in calculation of support. See, e.g., *Birkhold* v. *Birkhold*, supra, 343 Conn. 797–98.

[12] The business owner's ability to deduct the business expenses paid using the PPP and EIDL funds is consistent with the inclusion of those funds in the defendant's gross business receipts as provided for in the agreement.

[13] Although our disposition of the plaintiff's claim in part I of this opinion disposes of this appeal, we address this claim because it is likely to arise on remand. See, e.g., *Ferraro* v. *Ferraro*, 168 Conn. App. 723, 733 n.7, 147 A.3d 188 (2016).

[14] Because we address this claim as an issue likely to arise on remand, we need not address whether the court's determination was harmful. See *State* v. *Raynor*, 337 Conn. 527 n.20, 561, 254 A.3d 874 (2020).

---